18-3553 and 18-3580 from the District of Minnesota. Lewis Gareis et al versus 3M Company et al. We'll hear from Ms. Zimmerman. Thank you, your honor, and may it please the court. South Carolina law imposes a duty to warn on manufacturers that have either actual or constructive knowledge of a danger. Either one is sufficient to trigger a duty to warn. Mr. Gareis offered evidence of both in opposing his motion, the 3M motion for summary judgment on the duty to warn claim and thus granting summary judgment on that record was an error that Mr. and Mrs. Gareis asked this court to correct. The standard is set out in Livingston versus Nolan where a duty to warn is triggered any time a manufacturer has either actual or constructive knowledge of a potential danger and this court is certainly aware of the standard applied when considering a motion for summary judgment. Gareis offered actual knowledge and the court specifically to the document appearing at app 1175 which Mr. Saket referenced at the end of his rebuttal remarks. There is evidence from the director of clinical affairs for 3M who is also the corporate representative Al Van Duren. He answers the question about actual knowledge that the district court was supposed to consider. What he says in June of 2010 in a marketing document summarizing a number of different studies, he says actually there is evidence that forced air warming use increases the risk of deep joint infection. That admission from Mr. Al Van Duren, the director of clinical affairs who was with these companies since the early 1990s, that alone was sufficient for Mr. Gareis to succeed at the summary judgment stage with respect to his duty to warm claim. Counsel, is that alone enough to say there is, it's a very short sentence, actually there is evidence that it increases the risk when the burden of, it has to show that there's reason to believe the product is likely to be dangerous. Is that enough? Yes your honor, under the summary judgment standard that is sufficient, that alone. And in fact if the facts are undisputed, what Mr. Gareis was entitled to at the summary judgment stage was every single inference in his favor as this court is aware. And the district court here unfortunately disregarded this key piece of evidence where the director of clinical affairs acknowledges the very evidence that was presented to the district court and he concludes in June of 2010, months prior to Mr. Gareis' surgery, that actually there is evidence that forced air warming use increases the risk of infection. The exact kind of problem that Mr. Gareis offered here or suffered here. But that wasn't the only piece of evidence that Mr. Gareis offered that evidenced actual knowledge of this particular defect. In November of 2006, and this appears at app 986, Mr. Van Duren sends out a letter to a and the hose of the bear hugger warming systems and talks about the potential risk for contamination. The reason that this was important was that anytime there's bacteria inside an operating room, that increases the risk of infection. And Mr. Saket has previously addressed a number of the different studies and our briefing addresses the studies that show that when there is a reservoir of bacteria in an operating room, it increases the risk of a deep joint infection. That's true in the case of an orthopedic surgery, which is the only thing that we're talking about with respect to this MDL. All of these patients are at a much higher risk because they need a smaller dose of bacteria to cause these potentially life-threatening infections. What we know from a number of the different studies that have been addressed earlier this morning, Oguz and Darush, is how we quantify what that kind of risk is when there's a certain number of increased bacteria or particles. That's the measure of interest, by the way, as 3M considered the potential risk that their product posed to these patients. They too have throughout the course of this, not just this litigation, but manufacturing this product, what they looked for was, are particles increased in the sterile field? And I think that that goes to some questions that Your Honor, Judge Kelly has asked. Is it matter if it's just over the sterile field? Is that sufficient? Or does it need to be the surgical wound? Well, the outcome that everybody has measured, that 3M has considered throughout the course of evaluating its device, and there are very limited number of studies, by the way, is whether or not there is an increased rate of particles over the sterile field. Mr. Alvandurin answers that question in the 30B6 testimony that was provided. He says it's on to warm. There is an increased number of particles over the sterile field. What Oguz and DeRouche tell us is what does that matter? How many over the sterile field make a difference? And they talk about essentially if there are 10, an additional 10 particulates over the sterile field, that's going to double the risk of infection that any particular patient is exposed to. But again, turning the court's attention back to the evidence that Mr. Garris offered in support of his failure to warn claim, at 1196, there's an internal document titled pre-warming. Again, this is from 2005, and it's written by Mr. Vandurin, the Director of Clinical Affairs for 3M. He talks in this particular chart about the pros and cons of using convective, that's forced air warming, blowing warm air on a patient during surgery versus before surgery. And importantly, this evidence shows that in 2005, Mr. Vandurin and the company considered that intraoperative warming is contraindicated. And they provide two examples in that particular pro and con chart. One is aortic cross clamp, a type of heart surgery. The second one is orthopedic cases. And so as the company is evaluating the pros and cons of warming a patient prior to the surgery starting, prior to the incision starting, one pro of warming it before the incision is made is that you can warm patient before that incision is made. He goes on to note that pre-warming a patient, again, warming the patient before that incision is made in the body, it reduces the potential for nosocomial transmission, that's hospital acquired transmission of pathogens, bacteria, by eliminating the need for intraoperative warming. This is not a new idea. I'm going to circle back maybe to the question that I had earlier, which is, and your point is that 3M is identifying some possible concerns with infection and this device or this forced air warming. But in those very same documents, they have the opposite sort of why that may not be true or why the risk may not be so high. So even at the point of summary judgment, is there enough when it's 3M balancing and looking at the different pros and cons as you've described them, is that enough to say it's likely that they knew that it was likely to be dangerous? Could a jury conclude that? Absolutely, Your Honor. A jury could conclude that. And there's a couple of different pieces of evidence I would point to. First of all, one of 3M's competitors, Stryker Corporation, has another forced air warming device product. It warms patients in much the same way by blowing air over the patient. The Stryker company puts a warning on their forced air warming product that says, beware of airborne contamination. And the fact that a competitor is warning about the exact risk that we're talking about in this litigation, the exact risk that Mr. Garris identified, and exactly what the district court was supposed to be considering when it was evaluating the duty to warn claim, is absolutely relevant evidence that is sufficient to get to a jury. If and when there's going to be a balancing about what was known and what should have been done, the jury is supposed to make that the summary judgment motion on the duty to warn is for Mr. Garris to offer testimony or evidence about actual knowledge or constructive. The district court properly notes in its order that Mr. Garris did, in fact, offer evidence on both counts. But instead, the district court erroneously suggests that these needed to be either medical or scientific findings in order to attach a duty to warn. That finds no support in the case law in South Carolina. The fact that this company knew about what the potential risk was, dating back to the early 1990s when they submitted applications to the FDA, and disclosed at that time that there was, in fact, a risk of airborne contamination. That appears at PX47, which is also AP464, the 510K application in 1996. Of course, as this court is aware from reviewing the materials, the original bear hugger device, the model 200, which was not for use in an operating room, it had a warning about the risk of airborne contamination on that device. But this company took that product, moved it into a more dangerous environment of use, the operating room, and removed the warning. This isn't an obvious risk that everybody would know about. Perhaps now, as we present argument to your honors in a virtual situation, given what we all now know about COVID, pathogens can be transmitted airborne. That's why we're all doing this remotely. That's been known to 3M and Horizon for decades. This is not new science. When Mr. Garris offered evidence of actual knowledge, and when Mr. Garris offered evidence of constructive knowledge in the form of the judgment stage on the duty to warn, this court had a duty to view that evidence in the light most favorable to Mr. Garris and allow, deny the motion for summary judgment and let a jury make a decision about a failure to warn. I see that my time has expired on this piece, and I'd like to save the rest of my time for rebuttal. If I may, one quick question. If we were to affirm the exclusion of the causation experts in the issue raised in the prior case, would we need to reach any of the issues you've raised in this case? Yes, your honor, you would, for a number of reasons. First of all, Mr. Garris, he had a number of experts that were not excluded. For example, Dr. Yadin David, who is the expert that Mr. Garris offered on issues of alternative design, including warning and safer alternatives. He has not been touched. He has not been Michael Buck was an expert disclosed by plaintiffs at the general causation stage. He did a number of tests that show that the bear hugger itself generates and emits particles, and that is true whether the blanket is attached to the bear hugger or whether there is no blanket attached to it. He also remains completely untouched by the court's order with respect to reconsideration. And what we would request is that this court remand for trial on the claim, and Mr. Garris would at that point bring motions to amend his expert reports to include reference to all of the new studies that have come out that link bear hugger to nosocomial hospital-acquired infection and airborne transmission of pathogens. Thank you, Ms. Zimmerman. You may reserve the remainder of your time. Thank you. Mr. Van Oort, the court will hear from you, and if you wouldn't mind addressing my question, I'd appreciate that as a preliminary matter. Yes, Your Honor. I'm going to start there. This case is the individual claims of Mr. Garris. They only reached trial because the district court hadn't yet excluded the causation experts. If the medical causation experts are excluded, it moots this case. What Ms. Zimmerman just talked about, Dr. David is not a medical doctor. He's an engineer, and he just offered opinions for Mr. Garris about alternative designs here. The plaintiffs, when they claim that he is an alternative basis for summary judgment, in the main MDL, they never even mentioned his name in opposing summary judgment on a medical causation, literally never said his name in their briefs. He is not adequate support, and Michael Buck isn't a medical doctor, and Ms. Zimmerman in the transcript below in the main MDL said out loud that they aren't relying on Mr. Buck for causation. Let me follow up on that question if I could. There was a 2018 study that addressed the impact of the MSAA screenings. Is that part of the record in this case? No, it's not relevant to the duty to warn, Your Honor, and this is something I wanted to go to too. The summary judgment argument that Ms. The duty to warn had to arise at the time the device was shipped, manufactured. That's the opinion of the South Carolina Supreme Court in their controlling opinion on this. They said post manufacture evidence is irrelevant. A large part of the evidence that plaintiffs talked about in their brief hearing that came up in the argument this morning is not pre-2009 evidence. It's their trial evidence on their other theory, their design theory, so you've got to be really careful not to on this because the later evidence is irrelevant. Here, the evidence, there's a chart at the beginning of the plaintiff's reply brief here that lists all these studies they relied on, this eight of the studies. Seven of those eight studies came too late. They came after this was gone. The only study they cite that was at the relevant time was Mr. Albrecht's first one, and that was his particle study, and in that particle study he said the present study did not evaluate the link between forced air warming and surgical site infections. That's Appendix 798. This goes right to Judge Kelly's questions about what was known and not known. So as of 2009, and by the way, plaintiffs agree in their reply brief that 2009 is the relevant date here. Page three of their reply brief, they acknowledge that. So the studies as of 2009, there was Avadon, which they cite on there, but what they don't reveal is that Avadon, this is a 1997 study, Avadon tested without the blanket attached, and then it tested with the blanket attached, and when the blanket was attached, they found, quote, when the warmers were set to blow through the perforated blankets, no growth occurred. In other words, there's no bacteria when the blankets were there. So that's what was known as of 1997. That's Appendix page 475. The other two studies that existed as of 2009 in this frame that were relevant, there was a study by Mamarzadeh. He did a computational fluid dynamics study for the National Institutes of Health, and he found no significant influence on there, and then there was the Moretti study that we talked about in the last article that affirmatively concluded that forced air warming didn't pose a risk and that plaintiffs have mishandled here. This relates to the documents of Mr. Van Duren that were brought up here. There are a couple of points about those documents. First of all, plaintiffs never cited them below in the district court in opposing summary judgment on their duty to warn. Their brief, the section of their brief is docket 65, and pages 15 to 20 is the part where they oppose summary judgment here. They never mention these documents from Mr. Van Duren. The documents are elsewhere in the MDL, huge, of course, but they didn't mention them here. The other, so they're waived. It would be unfair to reverse the district court on evidence that wasn't brought in front of even if they're considered they're irrelevant. Judge Kelly, the first one is a comment in the margin where Mr. Van Duren being the scientist that he is, there are marketing folks who are going to say there's no evidence, and he being a scientist said, well, there is evidence. He referred to the Dr. Mamarzadeh study. Mamarzadeh had responded to the fact that some people had speculated that there may be a link between forced air warming and infections, so Mamarzadeh went and didn't find it, and what Mamarzadeh expressly says on this, this is the conclusion. I'm quoting from app 577. This investigation validates Moretti et al.'s conclusion that forced air warming technology does not increase the risk of surgical wound infection. So that's what the evidence said. Council mentioned the 510K application for the Bear Hugger here. They mentioned the same thing in their brief. They portray it as 3M admitting that there's a risk. Actually, it does exactly the opposite. So in the 510K filing, here's what 3M said. It said two studies have concluded that Bear Hugger 500 series units have the same air output specs and the same filter density as model 505, do not increase the incidence of microbial or wound contamination. That's what the FDA application said. That's actually at page app 974. So that's the 510K. Which brings me to COVID. Council mentioned COVID in the argument this morning. It's nowhere in the record, and this shows just how important it is for the district court to be careful, because again, this isn't in the record. Viruses are an order of magnitude smaller than bacteria, and they're 100 times smaller than the particles that matter here, which is why people talk about things going viral and not bacterial. This is outside the record, but you can go to the Mayo Clinic, you can go anywhere that wants, and there's absolutely no scientific support for this. Which is why, you know, going back to the first one, you have district courts charged with being gatekeepers, so baseless things don't confuse the jury. There is nothing, your honor, going back to the legal standard. The legal standard requires here that they show that there is a likely to be dangerous, it's a foreseeability standard. It's not a speculative standard. It requires there to be an actual showing, and going back to the relevant time, 2009, I've just covered the key evidence. The rest of it's treated in our brief. It doesn't exist. The district court was correct to grant summary judgment on that. Council doesn't discuss what happened at the trial, and I won't either, unless your honors know. One thing, though, that doesn't really jump out of the record, that's important. Plaintiffs had the two different theories, the dirty machine theory, and then the air flow disruption theory on this. The district court in the Garris trial excluded the dirty machine theory, and they never appealed it. So, it's not even an issue. So, any discussions about filters, you know, adding filters is just irrelevant here, because filters don't do anything for air flow disruption. Your honors. Council, when I read the district court's opinion here, the district court didn't engage in a lot of analysis. For example, you've raised the point that you believe that some of the argument here today was not regarding certain documents, was not presented to the district court. Does it matter that the analysis was so brief by the district court in this case? In other words, we're talking about it in a lot more detail than was presented in that order. Oh, I don't think so, your honor. You know, your honors review this de novo on the summary judgment, and so you can go and look at the same record that the district court had. So, it doesn't matter then if in fact the district court had those documents highlighted to it? Oh, well, I think waiver is pretty clear here, your honor. The plaintiffs can't rely on appeal the things they never presented to the district court at summary judgment. That's not it. I understood you to be saying, is there any reason to be concerned that the district court didn't spend a lot of time explaining this on that? And as to the, maybe I'm getting the tenor of your question. No, no, that's exactly right, and I think I misunderstood your point on the record evidence. You're saying that was not put into the record. Those documents were not put into this record. Is that what you're saying? Yeah, I'm saying they're in the the garris record for the case as a whole. They show up there. We cite them in the pennix, but when it came time to actually fight about summary judgment on duty to warn, the plaintiffs never said to Judge Erickson, your honor, the reason that we survived this and there was evidence is because they're documents that show that Tram knew. They never said that, and they didn't cite them in their brief to her. They never gave her a chance to address them, and you can't come up on appeal after you haven't done that and say, well, boy, now, you know, we really wish we had presented this other evidence and it'd make a difference. You know, I've explained, your honor, why it doesn't make a difference anyway. It goes to exactly this point. It's one thing to spot speculative risks. It's another thing to say it's likely to be dangerous. Law draws a really clear line between this and the documents that show that Tram was spotting risks. It was responding to Scott Osteen's relentless efforts to gin all of this up and had to keep beating it back and saying, no, actually, the real evidence shows there's no risk. I'm happy to address any other questions your honors have about this appeal. Otherwise, I'll surrender the rest of my time. Very well. Hearing no further questions, rebuttal by Ms. Zimmerman. Yes, thank you, your honors. To address the question specifically about waiver, I would point the court to app 986, the summary judgment PowerPoint that was offered by plaintiffs and received do in fact contain all of these documents. In particular, the Al simply not true to say that plaintiffs have waived this argument or did not present it to the district court who is well aware of these documents. The decision in five star in South Carolina talks about how manufacturers cannot turn a blind eye to the obvious. What counsel for 3M is not able to do is to point to any different studies that have shown that there is a risk in use of this particular product. I turn the court's attention back to app 1177, which is an email from 2012, again, from the corporate representative Al Van Duren. He talks about how, and it says this specifically, I'll quote it, Dr. Augustine and others made it clear to me when I started here in 1994 that some clinicians had concerns about particulates as causes of wound infection. As a result of those conversations, I submitted invention disclosures for air free warming devices. He submitted patent applications in 1994, in 2002, and then again in 2011 when he was part of 3M. This was because the company understood and appreciated that particulates were understood to be the cause of wound infection. And 3M is unable, as it sits here today and presents argument to this honorable court, to explain that this particular product is in fact safe. They can't point the court to any studies that the company has done to rule out this particular risk. And in fact, what the evidence shows is that their internal company employees recognize the risk and that their competitors recognize the risk. And when Mr. Van Duren and other people inside the company evaluated both the risk utility of this particular product and potential design defects, and I point the court for the second main issue on appeal, the design defect claim and the failure to admit company documents, appearing at 1196 again is this document about pre-warming from January of 2005. It's disingenuous for counsel to argue and say that all of these documents that we've cited to are after the time that the bear hugger was sent to the hospital in 2009 or after the time of Mr. Garris' surgery in 2010. That's not what the facts show, and the court will definitely see this as it reexamines the record closely. But this particular document shows that there were reasonable alternatives that were known to the company that were safe, that were effective, and the company went through and did a cost-benefit analysis. And because of that, under the law in South Carolina, in Branham specifically, it was legal error to prevent plaintiffs from allowing that evidence to be considered by the court. If the court has any questions, I'm happy to field those. Hearing none, thank you, Ms. Zimmerman. This case likewise will be submitted. We appreciate your arguments and stand by. I think you're both on the next case as well.